NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | Bankruptcy Case No. 04-15194 |
| Pro Auto Recyclers, Inc. | : | Chapter 7 |
| Debtor. | : | |
| Andrea Dobin, Trustee | : | |
| Plaintiff | : | |
| vs. | : | Adversary No. 04-2602 |
| Stadium Auto Wreckers | : | |
| | : | **MEMORANDUM OPINION** |
| Defendant | : | Hearing Date: January 10, 2006 |
| | : | and February 16, 2006 |

**APPEARANCES**

Attorney for Plaintiff, Andrea Dobin, Trustee
Jeffrey S. Posta, Esquire
Sterns & Weinroth
50 West State Street, Suite 1400
PO Box 1298
Trenton, New Jersey 08607-1298

Attorney for Defendant, Stadium Auto Wreckers
Gregory M. Gennaro, Esquire
60 Walnut Avenue, Suite 180
Clark, New Jersey 07066


The Honorable Kathryn C. Ferguson, USBJ

Andrea Dobin, Chapter 7 Trustee for Pro Auto Recyclers, Inc. ("Pro Auto" or "Debtor"), filed the within complaint against Stadium Auto Wreckers ("Stadium" or "Defendant") to recover account receivables reflected in the Debtor's books and records. This court has jurisdiction pursuant § 1334(b) and § 157(b)(1). The trial concluded on February 16, 2006, and the parties submitted written closing statements on February 24, 2006.

Facts

Pro Auto was formed in 1996 by Virginia Whelan and the principals of three other Automotive Recycling businesses. Each of the original participants in Pro Auto was a shareholder and officer. The asserted purpose of forming the new corporation was to allow the participants to combine certain resources and expenses, and homogenize certain of their business practices. The members of Pro Auto were to retain their individual business identities, but did business under the name "Pro Auto Recyclers". They hoped to create a nationally known "brand." The original Pro Auto participants envisioned the relationship of each of their businesses as folding into a franchise of Pro Auto, although apparently none ever entered into formal franchise agreement. Pro Auto ultimately functioned as a marketing/trade group, in which each of the participants was envisioned to pay its own share of Pro Auto's corporate expenses.

Pro Auto began by purchasing a truck and hiring a driver to facilitate deliveries. As time went on, Pro Auto acquired an outside sales person, some administrative staff, and some incidental marketing expenses, all as part of branding and marketing the "Pro Auto Recyclers" name. The Pro Auto participants agreed to uphold certain standards and procedures, to run their payroll and insurance through common

agencies, to utilize the same computer platform, and to contribute to joint marketing and administrative expenses. All of this sounds much more organized that Pro Auto's organization apparently was. To describe Pro Auto's actual structure, purpose and organization as "fluid" is a bit of an understatement.

Nonetheless, the shareholders apparently continued to meet regularly, without any documentation of what went on at the meetings, and to solicit other participants. The Defendant was one such entity solicited. Stadium's principal, Steve Cilento, was known to the Pro Auto shareholders through various professional organizations. One or more of the Pro Auto shareholders "pitched" the Pro Auto concept to Mr. Cilento and although he had many questions, convinced him to participate. They spoke in terms of a proposed franchise agreement, although no franchise agreement was ever signed, and took from Stadium a $15,000 "franchise fee." Stadium also apparently agreed, although again there is no documentation, to pay some sort of 8% "royalty fee".

Things between Pro Auto and Stadium went badly almost from the first. Notwithstanding the lack of franchise or any other agreement, Stadium paid the "royalty fee" for approximately six months. Stadium also paid for delivery and certain marketing services. For a period of time, Stadium also paid increasingly escalating invoices for various corporate and marketing services, for which it was being billed without either input or contract. Stadium repeatedly asked for backup invoices for the services for which it was being billed, but was rebuffed. Eventually, Stadium simply stopped paying for services for which it did not receive backup documentation. During the course of this period, Mr Cilento voiced multiple complaints; Ms. Whalen's standard response was that Stadium could "leave" Pro Auto. The invoices continued to flow. On May 6, 2003, Mr Cilento sent a fax to Pro Auto indicating that Stadium planned "to pay for all outstanding pro corp invoices we rightfully owe you for," and to "continue to make payments on the

following invoices...."

## Discussion

The Trustee's Complaint seeks turnover of accounts receivable. The Complaint alleges that the Debtor's bona fide records reflect that Stadium owes the estate the sum of $52,996.70. The Trustee seeks recovery on essentially two theories: first that all the invoiced amounts are due on a book account; and second, that Stadium admitted that the $26,677.97 due on the invoices listed in the May 6, 2003 fax were rightfully due and owing. Neither theory sustains the entry of a judgment in favor of the Trustee.

The flaw in the first theory is the assumption that an invoice is sufficient to prove the existence of a debt; it is not. The mere fact that someone sends out a bill does not oblige the other party to pay it. The evidence submitted by the Trustee consisted of invoices the Debtor generated [T4]; memos detailing expenses [T1 - T2, T3]; or communications regarding the failure to pay same [T6 - T8]. Glaringly absent was evidence of any agreement by Stadium to be responsible for those charges. The Trustee did not submit into evidence any written business agreement, minutes of meetings, or the like that would support an argument that Stadium agreed to obligate itself for those charges. In making her case, the Trustee is obviously constrained by the records kept by the Debtor, and in this instance those records do not support an action on a book account. While it is certainly possible for there to have been an oral agreement to pay these sums, the testimony at trial did not bear that out. The testimony at trial made clear that Virginia Whelan was by and large acting unilaterally. Even in the instances where there was prior discussion of an expense, such as with the Yellow Pages advertisement, Stadium and others were not provided with sufficient information upon which to make an informed decision. In fact, the testimony convincingly negated

such obligations. Gary Weisner of Manuels Auto Parts, another member of Pro Auto Recyclers, testified that when he left the meeting in which the Yellow Pages advertising was discussed he did not think that a final decision had been made. Mr. Weisner testified that there were no specific cost disclosures at that meeting and that he and Mr. Cilento had concerns about being in expensive books that covered Philadelphia and New York. The court is cognizant of the fact that Mr. Weisner is a defendant in another adversary proceeding brought by the Trustee, but the fact that his Yellow Pages expenses went from $300 a month to $1,300 a month with Pro Auto speaks for itself. It is inconceivable that experienced business people would agree to such a drastic increase in expense without a detailed accounting indicating precisely the books in which they would appear, what the ad would look like, or the likely benefit of advertising in an area from which they do not draw customers. Mr. Cilento similarly testified that without his authorization his Yellow Pages expenses went from approximately $300 to between $1,700 and $2,300 with Pro Auto. Both witnesses stated they had never seen the expense breakdown [T10] prior to this litigation.

In the closing argument, the Trustee asserted that the Defendant was "In for a Dime, In for a Dollar". In other words, the Debtor could not continue to receive the benefits of being a part of Pro Auto Recyclers yet not pay its share of the expenses. That is essentially a quantum meruit argument[1]. Quantum meruit is a form of quasi-contractual recovery and "rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." <u>Weichert Co. Realtors v. Ryan</u>, 128 N.J. 427, 437 (1992)(quoting Callano v. Oakwood Park Homes Corp., 91 N.J. Super. 105, 108 (App. Div. 1966)). Recovery is permitted in quasi-contract because one party has conferred a benefit on the other

---

[1] The Trustee's complaint did not contain a count based on quantum meruit.

5

and, in the circumstances, it would be unjust to deny recovery. Goldberger, Seligsohn & Shinrod, P.A. v. Baumgarten, 378 N.J. Super. 244, 252-53 (App. Div. 2005).

The difficulty with applying that theory to this case is that the ostensible benefit to Stadium has not been quantified. The Trustee has established that certain expenses were incurred by Pro Auto, such as the computer and the advertising, but has not established that the value of those to Stadium exceeds the amounts Stadium has already paid. In other words, there is no evidence that Stadium has been unjustly enriched. The law is clear that a party asserting a quasi-contractual theory may not rely on an unenforceable contract or invoice to establish the value of a benefit conferred. The court has nothing that establishes the value to Pro Auto's participants of the advertising, computers, or other expenses other than Pro Auto's self-generated invoices. Barfield v. Manley, 2005 WL 3730516 at *4 (N.J. Super. App. Div. 2006)("Where a defendant challenges the value of services plaintiff rendered ... plaintiff cannot solely rely on the books of account or a quote of the price to be charged as evidence of the reasonable value of services."); *See also,* Hackensack Hosp. v. Tiajoloff, 85 N.J. Super. 417, 419-20 (App. Div. 1964); McElroy v. Ludlum, 32 N.J. Eq. 828, 838 (E. & A. 1880)(holding that where a contract for services was invalid under the statute of frauds, and plaintiff sued on a quantum meruit, the special contract was inadmissible as evidence of the value of the services rendered).

The Trustee's second theory rises and falls on a finding that the May 6, 2003 fax was an admission [T8]. The court cannot find that it was. It was not an unequivocal statement of amount owed. By its very terms, it is limited to "all outstanding Pro Corp invoices we rightfully owe you for". Invoice numbers are listed, but it does not indicate that the invoices listed fall into that category; it simply says that payment will be made on those invoices. Again in the final paragraph, it states that Stadium "will pay for any charges

we signed for, and rightfully owe." As has been established, few if any of the expenses the Trustee seeks payment for were "signed for". Given the equivocal nature of the fax and the fact that Mr. Cilento testified that he merely sent it to get Pro Auto to stop harassing him for payment, the fax cannot be accorded the evidentiary weight of an admission. The court previously denied summary judgment on these grounds and no more convincing evidence of the accuracy of the fax was adduced at trial.

The Trustee was placed in a difficult position here because the corporate structure appears to have been grossly abused in this situation. The books and records of the Debtor indicate that some goods and services were exchanged between Pro Auto and Stadium on some basis, but they woefully deficient to establish exactly what obligations were rightfully imposed and rightfully remain outstanding. The Trustee inherited the books and records in the state they were in, but unfortunately for creditors, bears the burden of proving that these amounts were rightfully due and owing. It is not possible to find the Trustee has done so on this record.

The Court will enter Judgment for the Defendant. Defendant should submit a form of order in accordance with this opinion.

_____
KATHRYN C. FERGUSON, USBJ
US Bankruptcy Court

Dated: May 10, 2006